# STATE OF VERMONT

**SUPERIOR COURT**  **CIVIL DIVISION**
**Washington Unit**  Docket No. _____

| | |
|---|---|
| **PELIN KOHN, PhD,** | ) |
|  | ) |
| **Plaintiff,** | ) |
|  | ) |
| v. | ) |
|  | ) |
| **NORWICH UNIVERSITY,** | ) |
|  | ) |
| **Defendant.** | ) |

## COMPLAINT

Plaintiff Pelin Kohn, PhD hereby complains against Defendant Norwich University ("Norwich") as follows.

### Introduction

1. This is an employment discrimination suit to hold Norwich University responsible for discrimination and retaliation against Plaintiff Pelin Kohn, PhD. Norwich discriminated against Dr. Kohn based on her national origin, ethnicity, and gender. When Dr. Kohn took medical leave as a result of its hostility, Norwich retaliated against her for exercising her statutorily-protected right to take leave and for the earlier complaints she had lodged about the discrimination and harassment she endured in the workplace. On top of it all, Norwich violated its written policies through the discriminatory and retaliatory actions it took against Dr. Kohn.

2. This is not the first time Norwich has engaged in discriminatory behavior. Norwich's toxic "old boys club" atmosphere has been well documented in the media and in prior lawsuits. This suit seeks in part to compel Norwich to reckon with the underlying dynamics that result in discriminatory practices like this one. Something has to change or history will continue to repeat itself.

## Parties, Venue, and Jurisdiction

3. Pelin Kohn is an individual resident of Vermont.

4. Dr. Kohn is an immigrant from Turkey and a naturalized U.S. Citizen. English is her second language.

5. Norwich University is a corporation with its principal place of business in Northfield, Vermont.

6. Jurisdiction and venue are proper because Dr. Kohn is complaining of conduct that occurred in Washington County and is actionable under Vermont law.

## Dr. Kohn's Experience

7. Dr. Kohn has a master's degree in education, as well as certificates in Diversity, Equity, and Inclusion and Strategic Foresight. She has a PhD in Educational Sciences, Administration and Planning. She has taught leadership skills to high-ranking executives at major global companies. She is currently earning her MBA at Vermont State University.

8. Since joining Norwich in 2018, Dr. Kohn's record has been one of exceptional performance and significant achievements. She has taught a wide range of courses on leadership.

9. Although Dr. Kohn never received a formal performance evaluation – in violation of Norwich's policies – she has consistently received positive feedback from her students.

10. In her time at Norwich, Dr. Kohn has held numerous administrative roles.

11. Dr. Kohn has also been recognized as an outstanding leader by outside organizations, in Vermont and nationally. She has received fellowships with the VCWA Global Leadership Program and HERS. She was named a chair of the Vermont Agency of Education Accreditation Committee, and she was selected as one of sixteen national reviewers for the Carnegie Leadership for Purpose classification. Dr. Kohn was recognized by Norwich for these efforts and awarded the Norwich University Bride Family Grant.

12. Dr. Kohn also engages in scholarly work, having signed three book contracts, published articles in national leadership magazines, and presented at national and global leadership conferences.

**The Leadership Program and Center**

13. In 2020, Dr. Kohn interviewed for and was hired as Leadership Coordinator by Norwich's former President, Mark Anarumo. She was tasked with creating a leadership program and curriculum, allowing students to major or minor in the field. Dr. Kohn completed the project in only six months and her plan was approved and implemented within a year. Norwich students were able to enroll in a four-year leadership degree path by August 2022.

14. Former President Anarumo was such a fan of Dr. Kohn and the leadership program she created that he asked her to create a Leadership Center. Dr. Kohn agreed to do so, even though she did not receive any additional compensation for doing so.

15. However, after Dr. Kohn created the Leadership Center, former President Anarumo sought to appoint a white male director as director of the Leadership Center.

16. Dr. Kohn understood former President Anarumo's position to mean Norwich preferred white male employees as directors and that she was not being considered for the director position because of her nationality and gender.

17. On information and belief, the white male picked to be the Director of the Leadership Center turned down the director position because the salary was too low.

18. Subsequently, in September 2022, Norwich named Dr. Kohn Founding Director of the Leadership Center and Department Chair of the Leadership Program but refused to name her director.

19. Dr. Kohn understood Norwich's refusal to appoint her as director to mean Norwich preferred white male employees as directors and that she was not named the Director because of her nationality and gender.

**Change In Leadership**

20. During the summer of 2022, Dr. Kohn got a new boss—Lea Williams was named Senior Associate Provost, and Dr. Kohn began reporting directly to her.

21. At all relevant times, Associate Provost Williams was acting within the scope of her employment with Norwich.

22. At first, Dr. Kohn's relationship with Associate Provost Williams was cordial and workable – until a new Provost was named.

23. That new Provost was Karen Gaines; once she became Provost, Dr. Kohn's working relationships changed overnight.

24. At all relevant times in this Complaint, Provost Gaines was also acting President of Norwich.

25. At all relevant times, Provost Gaines was acting within the scope of her employment with Norwich.

26. After Provost Gaines's appointment, Associate Provost Williams engaged in a pattern of behavior that was abusive and harassing.

27. Associate Provost Williams repeatedly accused Dr. Kohn publicly and falsely of doing things she had not done; claimed ignorance of details of projects that Associate Provost Williams was directly involved in; berated Dr. Kohn in front of others; excluded Dr. Kohn from meetings and discussions she should have been a part of; and ignored Dr. Kohn's emails and other attempts to communicate.

28. Associate Provost Williams's pattern of abusive and harassing behavior included, but was not limited to, an incident that occurred at a University Curriculum Committee meeting regarding leadership courses.

29. In that meeting, Associate Provost Williams falsely claimed that Dr. Kohn submitted missing documents and cautioned Dr. Kohn to be careful when completing paperwork, even though Dr. Kohn had already sent all the required paperwork to Associate Provost Williams.

30. Similarly, when Dr. Kohn attempted to address an issue relating to pre-requisite courses being removed, Associate Provost Williams refused to respond to any of Dr. Kohn's emails. When Dr. Kohn insisted on receiving a reply, Associate Provost Williams cautioned Dr. Kohn about her tone, despite understanding that English was Dr. Kohn's second language.

31. When Dr. Kohn attempted to address her concerns about Associate Provost Williams's treatment, Associate Provost Williams brushed her aside.

32. When Dr. Kohn reported these concerns to human resources ("HR"), HR referred Dr. Kohn back to Associate Provost Williams. Because Associate Provost Williams had already brushed her aside, Dr. Kohn did not file a report about these concerns until January 2024.

33. Likewise, Provost Gaines was hostile to Dr. Kohn almost from the moment of her arrival, including unprofessional remarks about Dr. Kohn's presence at Norwich and about Dr. Kohn's husband, the Dean of the College of Arts and Sciences at Norwich.

34. On information and belief, Associate Provost Williams and Provost Gaines are personally close, and present a united front in all matters.

35. On information and belief, Provost Gaines and Associate Provost Williams's hostility was rooted in discriminatory animus towards Dr. Kohn's national origin.

36. To take one instance, when Dr. Kohn was tasked with preparing a speech introducing Provost Gaines at a leadership conference, Dr. Kohn used the phrase "first annual" rather than "inaugural," as she has difficulty pronouncing "inaugural" and did not want to make an error in front of the conference participants. Rather than offering help or another suggestion, Associate Provost Williams criticized Dr. Kohn publicly, in an email circulated to others, for having made a "grammar mistake" in using "first annual."

37. That discriminatory animus was not limited to Provost Gaines and Associate Provost Williams.

38. In preparation for a meeting with a retired CIA officer, a Norwich faculty member sent an email asking if everyone who would be participating was a US citizen. As she is a US citizen, Dr. Kohn felt no need to reply to this email. But the faculty member did not accept that—instead he emailed Dr. Kohn's husband to confirm that Dr. Kohn was a citizen, subjecting her to unwarranted extra scrutiny because of her background. Dr. Kohn's husband reported this to Provost Gaines as an incident of discrimination based on national origin.

39. On information and belief, Provost Gaines took no steps to investigate this incident of discrimination against Dr. Kohn.

### July 7, 2023 Meeting

40. On July 7, 2023, Dr. Kohn was invited to a meeting with Provost Gaines and Associate Provost Williams. Dr. Kohn was not informed of the topic of the meeting.

41. On information and belief, the meeting was a deliberate ambush by Provost Gaines and Associate Provost Williams.

42. On information and belief, Provost Gaines called the meeting because she was upset that Dr. Kohn had invited former President Anarumo to give the keynote speech at the launch of a program providing leadership learning experiences for faculty and staff, called LEAP (a program that President Anarumo had spearheaded). Provost Gaines claimed to have been completely unaware of the existence of the program, even though Dr. Kohn had been working on the program for a year, with the full approval and involvement of Associate Provost Williams, including weekly status reports.

43. In the same meeting, Associate Provost Williams falsely claimed to Provost Gaines to have learned of the program only two days prior.

44. Provost Gaines then stated that she "would never work with" Dr. Kohn.

45. Provost Gaines and Associate Provost Williams's behavior in the meeting clearly demonstrated their continuing animus towards Dr. Kohn based on her national origin and ethnicity.

46. Dr. Kohn was so taken aback by Provost Gaines and Associate Provost Williams's comments and behavior during the meeting that she explicitly told them that she was being mistreated because of her national origin and ethnicity.

47. Provost Gaines ignored Dr. Kohn's complaint and refused to engage in the topic.

48. Associate Provost Williams's blatant misrepresentation regarding her knowledge of the LEAP program undermined Dr. Kohn's ability to trust Associate Provost Williams and disparaged Dr. Kohn's integrity.

49. Provost Gaines's refusal to address Dr. Kohn's concerns and refusal to work with Dr. Kohn made Dr. Kohn's then-role as Founding Director of the Leadership Center completely untenable.

50. As a result of Provost Gaines and Associate Provost William's statements and actions, after the July 7, 2023 meeting, Dr. Kohn resigned as Founding Director of the Leadership Center, in the hope that returning to primarily teaching duties would reduce the mistreatment she was experiencing.

51. Dr. Kohn suffered significant loss of income because of her resignation.

**Continued Discrimination and Ineffective Investigation and Response**

52. Dr. Kohn's situation did not improve after she resigned from the Leadership Center.

53. To avoid interacting with Associate Provost William's continued hostility, Dr. Kohn asked to be put in a new position. Although Norwich had taken that step for other employees, the University refused to do so in Dr. Kohn's case.

54. On information and belief, Associate Provost Williams's continued hostility was rooted in discriminatory animus towards Dr. Kohn's national origin.

55. Associate Provost William's abusive and harassing behavior were the subject of Dr. Kohn's second complaint of discrimination and harassment, which she filed on January 13, 2024 ("January 13 Complaint").

56. Because of the impact this hostile work environment had on her health, Dr. Kohn was advised to take medical leave, and she was out on statutory leave from January 17, 2024 to April 30, 2024.

57. Dr. Kohn's January 13 Complaint was referred to outside counsel for investigation. Outside counsel did not complete his investigation until July 2024, seven full months after Dr. Kohn's January 13 Complaint was made and well after Dr. Kohn had been retaliated against for taking leave.

58. On information and belief, the investigator utterly failed to investigate or Dr. Kohn's other complaints of retaliation, which occurred while he was investigating Dr. Kohn's January 13 Complaint.

59. Dr. Kohn was never provided with the investigator's written report.

60. Instead, Norwich's HR Director told Dr. Kohn over the phone that no discrimination had occurred.

61. After the ineffective investigation, Dr. Kohn attempted to seek redress from Norwich's Title VII investigator in Fall 2024.

62. The Title VII was no help, summarily informing Dr. Kohn that it was not a Title VII issue.

## Retaliation

63. While Dr. Kohn was out on a statutorily protected leave, and after submitting her January 13 Complaint of discrimination and harassment, Norwich—acting through Provost Gaines, who was also the Acting President of Norwich at the time—retaliated against her in a number of ways.

64. While Dr. Kohn was on medical leave, Provost Gaines hired a new faculty member to teach a leadership course, without Dr. Kohn's knowledge or approval, though she was still the Department Chair of the Leadership Program, as she had only resigned from her position as Founding Director of the Leadership Center.

65. While Dr. Kohn was on medical leave, she was not invited to the annual meeting of all Chairs, Directors, and Deans, even though others had been invited months earlier and even though the meeting would be held after Dr. Kohn's leave would be completed.

66. While Dr. Kohn was on medical leave, the Provost's Office unilaterally changed Dr. Kohn's title of Department Chair of the Leadership Program to "Coordinator" of the program, even though she had a contract entitling her to serve as Chair through June 30, 2024.

67. On April 18, 2024, while still on leave, Dr. Kohn was informed that two other individuals would be co-Directors of the Leadership Center, that she would be replaced as Department Chair of the Leadership Program by one of the individuals and that she would be offered only a Lecturer's position for the upcoming academic year.

68. Both individuals replacing Dr. Kohn were white males without any experience developing a leadership curriculum or a leadership program.

69. To justify replacing Dr. Kohn with these inexperienced white males, Associate Provost Tara Kulkarni told Dr. Kohn that Norwich wanted co-Directors and Department Chairs who would "behave more like Travis Morris" – a white male director of the University's Peace and War Center.

70. Dr. Kohn understood Associate Provost Kulkarni's comment to mean Norwich preferred white male employees and that she was being demoted and retaliated against because of her nationality and gender.

71. While on leave, Norwich demoted Dr. Kohn to a Lecturer's position and substantially reduced her compensation, all while increasing her teaching load.

72. Despite proposing a transfer to another department with administrative duties, Dr. Kohn's suggestion was ignored and she was demoted.

73. After this demotion, Dr. Kohn no longer led the leadership program that she created.

74. Related to the demotion, Dr. Kohn was also denied compensation for being Chair of the Leadership Program between May 15, 2024 and June 30, 2024, despite having a contract running through June 30, 2024.

75. On April 21, 2024, again during Dr. Kohn's leave, Associate Provost Williams invited Dr. Kohn to a meeting to discuss her fall schedule.

76. Dr. Kohn asked a representative from HR to attend this April meeting with her, as was her right.

77. When Dr. Kohn arrived for the meeting, Associate Provost Williams's assistant physically barred Dr. Kohn from entering the office.

78. On information and belief, Associate Provost Williams's assistant barred Dr. Kohn from entering the office because Associate Provost Williams did not want to meet with Dr. Kohn while HR was present. However, Associate Provost Williams did wish to meet with the HR representative without Dr. Kohn present.

79. Dr. Kohn returned to work on May 1, 2024.

80. Having no choice, Dr. Kohn accepted her demotion to a Lecturer position for the 2024-25 academic year.

81. During Summer 2024, on information and belief, multiple alumni, students, and faculty members complained about Provost Gaines's impact on Norwich.

82. Because Norwich's demotion caused continued stress and significant impact on Dr. Kohn's mental health, her doctor recommended another medical leave.

83. Ultimately, Norwich's actions caused Dr. Kohn to resign from Norwich in Fall 2024.

84. If Dr. Kohn had retained the positions at Norwich, she likely would have been compensated at a salary of at least $75,000 per year with a retirement match.

85. Dr. Kohn intended to hold the positions at Norwich for at least 20 years until she retired. During that time, she would have received annual raises and bonuses.

86. As a result of Norwich's adverse employment actions, Dr. Kohn has suffered and will continue to suffer severe emotional distress, which will require significant time and

treatment. She has been diagnosed with anxiety and depression as a result of her work environment, and has been prescribed several medications. Her conditions manifest daily in an inability to focus or concentrate, to stop crying, or to sleep and eat.

87. As a result of Norwich's adverse employment actions, Dr. Kohn was forced to find a new job as a Coordinator of Student Advising at Community College of Vermont.

88. As a result of Norwich's adverse employment actions, Dr. Kohn was forced to pause her MBA program and apply for a new program at Vermont State University, delaying her graduation and causing additional expense.

### **Count I - Discrimination Based on National Origin and Gender**

89. Dr. Kohn incorporates the allegations contained in the previous paragraphs.

90. Vermont's Fair Employment Practices Act ("FEPA") makes it illegal to discriminate against an employee based on their national origin and gender.

91. Dr. Kohn was qualified for her positions as Founding Director of the Leadership Center and Department Chair of the Leadership Program.

92. Norwich discriminated against Dr. Kohn on the basis of her national origin by systematically undermining her position as Founding Director of the Leadership Center and Department Chair of the Leadership Program, causing Dr. Kohn to resign as Founding Director of the Leadership Center.

93. Norwich discriminated against Dr. Kohn on the basis of her national origin by repeatedly relating false information about her conduct and actions as Founding Director of the Leadership Center and Department Chair of the Leadership Program, causing Dr. Kohn to resign as Founding Director of the Leadership Center.

94. Norwich discriminated against Dr. Kohn on the basis of her national origin by unilaterally changing Dr. Kohn's title of Department Chair of the Leadership Program to "Coordinator" of the program, even though she had a contract as Chair through June 30, 2024; by demoting Dr. Kohn to a Lecturer's position for the 2024-25 academic year; and, by replacing Dr. Kohn as Department Chair of the Leadership Center with a male.

11

95. Norwich discriminated against Dr. Kohn on the basis of her gender by replacing her with two white male co-Directors of the Leadership Center, who were less experienced than her.

96. Norwich discriminated against Dr. Kohn on the basis of her gender by replacing her with a white male Department Chair of the Leadership Program who was less experienced than her.

97. Norwich's conduct towards Dr. Kohn created a hostile working environment.

98. Norwich's conduct towards Dr. Kohn permits an inference of discrimination.

99. As a direct result, Dr. Kohn suffered damages for which she seeks compensation.

100. In addition, FEPA entitles Dr. Kohn to recover her attorneys' fees and costs if she prevails.

## Count II - Retaliation

101. Dr. Kohn incorporates the allegations contained in the previous paragraphs.

102. FEPA makes it illegal to discriminate against a candidate because she has "opposed any practice made unlawful by this section."

103. When it was clear to Dr. Kohn that Norwich was illegally discriminating against her because of her national origin, she spoke up in opposition, specifically stating that she felt like she was being mistreated because of her national origin.

104. Norwich refused to do anything in response to Dr. Kohn's complaints, causing Dr. Kohn to resign as Founding Director of the Leadership Center.

105. On January 13, 2024, Dr. Kohn filed a complaint with HR at Norwich describing the continuing hostile work environment that she was subject to as a result of her national origin.

106. Immediately following this complaint, on January 17, 2024, Dr. Kohn took medical leave.

107. While on leave, Dr. Kohn suffered adverse employment actions when Norwich:

    a. Hired a new faculty member to teach a leadership course, without Dr. Kohn's knowledge or approval;

    b. Neither invited Dr. Kohn to regular monthly program meetings, nor invited her to the annual meeting of all Chairs, Directors, and Deans;

    c. Unilaterally changed Dr. Kohn's title of Department Chair of the Leadership Program to "Coordinator" of the program, even though she had a contract as Chair through June 30, 2024;

    d. Demoted Dr. Kohn to a Lecturer's position for the 2024-25 academic year; and,

    e. Replaced Dr. Kohn as Department Chair of the Leadership Center with a less experienced white male.

108. Norwich's adverse employment actions against Dr. Kohn constituted retaliation against her for having complained of national origin discrimination.

109. As a direct result, Dr. Kohn suffered damages for which she seeks compensation.

110. In addition, FEPA entitles Dr. Kohn to recover her attorneys' fees and costs if she prevails.

**Count III - Discrimination for Taking Leave
Under the FMLA and Vermont's PFLA**

111. Dr. Kohn incorporates the allegations contained in the previous paragraphs.

112. Vermont's Parental and Family Leave Act ("PFLA"), 21 V.S.A. §§ 472, § 473, makes it illegal to discriminate against an employee when an employee takes medical leave.

113. The Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 et seq., makes it illegal to discriminate against an employee when an employee takes medical leave.

114. Dr. Kohn exercised her rights under the FMLA and Vermont's PFLA when she took medical leave in January 2024 to recover from the harmful effects of Norwich's discriminatory acts against her.

115. Dr. Kohn was qualified for her position as Department Chair of the Leadership Program.

116. While on leave, Dr. Kohn suffered adverse employment actions when Norwich:

13

    a. Hired a new faculty member to teach a leadership course, without Dr. Kohn's knowledge or approval;

    b. Neither invited Dr. Kohn to regular monthly program meetings, nor invited her to the annual meeting of all Chairs, Directors, and Deans;

    c. Unilaterally changed Dr. Kohn's title of Department Chair of the Leadership Program to "Coordinator" of the program, even though she had a contract as Chair through June 30, 2024;

    d. Demoted Dr. Kohn to a Lecturer's position for the 2024-25 academic year; and,

    e. Replaced Dr. Kohn as Department Chair of the Leadership Center with a less experienced white male.

117. Because Norwich demoted Dr. Kohn, Dr. Kohn was also denied compensation for being Chair of the Leadership Program between May 15, 2024 and June 30, 2024, despite having a contract running through June 30, 2024.

118. Norwich willfully discriminated against Dr. Kohn for exercising her medical leave rights.

119. Dr. Kohn would not have been discriminated against but for exercising her medical leave rights.

120. In discriminating against Dr. Kohn for taking her medical leave, Norwich knew it was violating her rights under law and showed reckless disregard for her medical leave rights, as the adverse actions taken against Dr. Kohn were made within months after she renewed a discrimination complaint in January 2024.

121. As a direct result, Dr. Kohn suffered damages for which she seeks compensation.

122. In addition, both the FMLA and Vermont's PFLA entitle Dr. Kohn to recover her attorneys' fees and costs if she prevails.

**Count IV - Retaliation for Taking Leave
Under Vermont's PFLA and the FMLA**

123. Dr. Kohn incorporates the allegations contained in the previous paragraphs.

124. Vermont's PFLA, 21 V.S.A. §§ 472, § 473, makes it illegal to interfere or retaliate when an employee takes medical leave.

125. The FMLA, 29 U.S.C. § 2601 et seq., makes it illegal to interfere or retaliate when an employee takes medical leave.

126. Dr. Kohn exercised her rights under Vermont's PFLA when she took medical leave in January 2024 to recover from the harmful effects of Norwich's discriminatory acts against her.

127. Dr. Kohn was qualified for her position as Department Chair of the Leadership Program.

128. While on leave, Dr. Kohn suffered adverse employment actions when Norwich:

    a. Hired a new faculty member to teach a leadership course, without Dr. Kohn's knowledge or approval;

    b. Neither invited Dr. Kohn to regular monthly program meetings, nor invited her to the annual meeting of all Chairs, Directors, and Deans;

    c. Unilaterally changed Dr. Kohn's title of Department Chair of the Leadership Program to "Coordinator" of the program, even though she had a contract as Chair through June 30, 2024;

    d. Demoted Dr. Kohn to a Lecturer's position for the 2024-25 academic year; and,

    e. Replaced Dr. Kohn as Department Chair of the Leadership Center with a male.

129. Because Norwich demoted Dr. Kohn, Dr. Kohn was also denied compensation for being Chair of the Leadership Program between May 15, 2024 and June 30, 2024, despite having a contract running through June 30, 2024.

130. Norwich's adverse employment actions were intentional and willful and give rise to an inference of retaliatory intent, as the adverse actions taken against Dr. Kohn were made

within months after she renewed a discrimination complaint in January 2024 and while she was out on statutorily protected leave.

131. As a direct result, Dr. Kohn suffered damages for which she seeks compensation.

132. In addition, both the FMLA and Vermont's PFLA entitle Dr. Kohn to recover her attorneys' fees and costs if she prevails.

## Count V - Failure to Provide a Comparable Job

133. Dr. Kohn incorporates the allegations contained in the previous paragraphs.

134. Vermont's PFLA, 21 V.S.A. §§ 472(f), requires an employer to offer the same or comparable job at the same level of compensation, employment benefits, seniority, or any other term or condition of the employment existing on the day leave begins.

135. During Dr. Kohn's medical leave, Norwich demoted Dr. Kohn and substantially reduced her compensation, all while increasing her teaching load.

136. Norwich violated Vermont's PFLA because, when Dr. Kohn returned from leave, she was not offered the same or comparable job at the same level of compensation, employment benefits, or seniority existing on the day leave her began.

137. As a direct result, Dr. Kohn suffered damages for which she seeks compensation.

138. In addition, Vermont's PFLA entitles Dr. Kohn to recover her attorneys' fees and costs if she prevails.

## Count VI - Promissory Estoppel

139. Dr. Kohn incorporates the allegations contained in the previous paragraphs.

140. Vermont's common law recognizes the doctrine of promissory estoppel.

141. Norwich's policies, as expressed in the Employee Handbook, promised that all members of the Norwich community be "provided with a respectful environment" that "preserves the dignity and integrity of all of its members," and that harassing or offensive behaviors based upon protected characteristics are "unacceptable," even if not unlawful.

142. Dr. Kohn relied on the fact that Norwich promised all employees that they would be provided with a respectful environment that preserved the dignity and integrity of all of its members.

143. Norwich, who created the Employee Handbook, policies and practices and whose employees made verbal and written promises to Dr. Kohn, intended her and other employees to rely on them, benefited from this reliance, and is obligated to follow those promises.

144. Norwich's promises also induced action and reliance by Dr. Kohn to accept the job at Norwich and to complain about discrimination and retaliation with the belief that she would not be punished.

145. Injustice and harm to Dr. Kohn can only be avoided by enforcing Norwich's promises.

146. Norwich's failure to honor its promises resulted in direct harm to Dr. Kohn.

147. As a direct result, Dr. Kohn suffered damages for which she seeks compensation.

### Count VII - Breach of Implied Employment Contract and Covenant of Good Faith and Fair Dealing

148. Dr. Kohn incorporates the allegations contained in the previous paragraphs.

149. Vermont's common law recognizes breach of contract and the covenant of good faith and fair dealing in both express and implied contracts.

150. Norwich's policies, as expressed in the Employee Handbook, constituted an implied contract between Dr. Kohn and Norwich, included a covenant of good faith and fair dealing, and promised an environment that "preserves the dignity and integrity of all of its members."

151. Norwich's actions willfully breached the parties' implied employment contract and its covenant of good faith and fair dealing and damaged Dr. Kohn.

152. Breach of the contract and the covenant justifies the imposition of damages upon Norwich.

153. As a direct result, Dr. Kohn suffered damages for which she seeks compensation.

WHEREFORE, Plaintiff requests the Court to grant the following relief:

1. An award of compensatory damages.
2. An award of punitive damages.
3. An award of attorneys' fees and costs incurred in connection with this litigation.
4. Such other relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff Pelin Kohn, PhD demands trial by jury on all issues so triable.

Dated at Burlington, Vermont this 10th day of March, 2025.

**PELIN KOHN, PhD**

By: */s/ Christina E. Nolan*
Christina E. Nolan, Esq.
Devin T. McKnight, Esq.
SHEEHEY FURLONG & BEHM P.C.
30 Main Street, 6th Floor
P.O. Box 66
Burlington, VT  05402-0066
(802) 864-9891
cenolan@sheeheyvt.com
dmcknight@sheeheyvt.com